**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO.**

RICHEMONT INTERNATIONAL SA,
CARTIER INTERNATIONAL A.G.,
CHLOE S.A.S., MONTBLANC-SIMPLO
GMBH, OFFICINE PANERAI A.G., and
VAN CLEEF & ARPELS SA,

                 Plaintiffs,

vs.

CARTIERCLONE.COM a/k/a BESTWATCH.SR;
CARTIERREPLICA.RU; CARTIERREPLICAWATCHES.CO;
CHLOEKIDS.COM; CHLOEREPLICA.RU; CHLOEREPLICA.TO;
DISCOUNTCHLOE.COM; IWCREPLICA.RU;
IWCWATCHBLOG.COM; MONTBLANCPENS-OUTLET.COM;
MONTBLANC-SALE.COM; MONTBLANCUK.CZ;
PANERAIREPLICA.CO; PANERAIREPLICA.RU;
RANKCHLOE.COM; SEEBYCHLOE.SHOP a/k/a
SEEBYCHLOE.STORE; SEEBYCHLOEFR.SPACE;
THECHLOE.SHOP; VANCLEEFARPELSREPLICA.RU;
VANCLEEF-ARPELSUS.COM; WATCHESPANERAI.RU;
5REPLICAWATCHES.COM; AAAWATCH21.COM a/k/a
AAAWATCHES21.COM; ALEEO.SHOP a/k/a ASXGVCLOR.XYZ
a/k/a COSPAI.SHOP a/k/a ECUTE.SHOP a/k/a ELSON.SHOP a/k/a
FIXDIN.SHOP a/k/a IDZYSXER.ONLINE a/k/a KENNDEY.SHOP
a/k/a KISAE.SHOP a/k/a KMBS.SHOP a/k/a PACUO.SHOP a/k/a
READA.SHOP a/k/a SHOKE.SHOP a/k/a TENKU.SHOP a/k/a
WATCHLOVE.SHOP a/k/a WEEFE.SHOP a/k/a
YWNEDHJM.ONLINE; BAGSREPLICA.CO; BESTMONTRE.FR;
CCHENWATCHES.COM; CHICTIN.COM a/k/a DANIYA.TOP;
CHINANOOBWATCH.CX a/k/a CHINANOOBWATCH.CO;
COLESTORE.RU; COPYWATCHES.XYZ;
CTECONOMICDEVELOPMENT.COM; DOLABUY.RU; EVERY-
DESIGNERS.RU; FAKEWATCHESSALES.COM a/k/a
FAKEWATCHSELLING.COM; FAUSSEMONTRE.COM;
FSFLINE.SHOP a/k/a SSLKJI.SHOP; FUWEN.SHOP a/k/a
GREENEZ.SHOP; HELLOREPLICAWATCH.COM; HOOO-
GOODS.COM; HOTHANDBAG.CN; IHAHABAGS.RU; KING-
WATCHES.CN; KITLIFE.RU; LUXEREPLIQUE.TO;
LUXURYWATCHESHQ.US; MONTREDEREPLIQUE.COM;
MONTRESPLUS.FR; NHORLOGE.NL; OUTLETLUXURY.SHOP;
OUTLETNOOBWATCH.COM a/k/a OUTLETNOOBWATCH.CO;
PASCHERMONTRE.COM; PERFECTBAGSSHOP.COM;

PERFECTJEWL.COM; REPLICABAGSEYES.COM;
REPLICAHANDBAGSALE.COM; REPLICAWATCH.TOP;
REPLICAWATCHES1.COM; REPLICAWATCHESMASTER.COM;
REPLIQUESUISSE.COM; SUISSEREPLIQUEMONTRE.COM;
TIKONE.RU; TRUSTEDREPLICAWATCH.COM;
WATCHOUTLETJP.COM;  and WATCHS.LIFE, Each an Individual,
Business Entity, or Unincorporated Association,

       Defendants.

_____/

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiffs, Richemont International SA, Cartier International A.G., Chloe S.A.S., Montblanc-Simplo GMBH, Officine Panerai A.G., and Van Cleef & Arpels SA ("Plaintiffs"),[1] hereby sue Defendants, the Individuals, Business Entities, or Unincorporated Associations, identified in the caption above and set forth on Schedule "A" hereto ("Defendants").  Defendants are promoting, offering for sale, selling, and/or distributing goods bearing and/or using counterfeits and confusingly similar imitations of Plaintiffs' trademarks within this district through at least the fully interactive commercial Internet websites operating under the domain names identified on Schedule "A" hereto (the "Subject Domain Names"). In support of their claims, Plaintiffs allege as follows:

## JURISDICTION AND VENUE

1.      This is an action for injunctive relief and damages for federal trademark counterfeiting and infringement, false designation of origin, cybersquatting, common law unfair competition, and common law trademark infringement pursuant to 15 U.S.C. §§ 1114, 1116, 1125(a), and 1125(d), The All Writs Act, 28 U.S.C. § 1651(a), and Florida's common law. Accordingly, this Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §

_____

[1] Plaintiffs are all subsidiaries of Compagnie Financière Richemont SA, which is one of the world's leading luxury goods groups.

1121 and 28 U.S.C. §§ 1331 and 1338. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' state law claims because those claims are so related to the federal claims that they form part of the same case or controversy.

2.      Defendants are subject to personal jurisdiction in this district because they operate commercial websites accessible in this district, conduct business by registering and maintaining the Subject Domain Names within the United States, and/or direct business activities towards consumers throughout the United States, including within the State of Florida and this district, through at least the fully interactive[2] commercial Internet websites accessible and doing business in Florida and operating under the Subject Domain Names. Alternatively, based on their contacts with the United States, Defendants are subject to personal jurisdiction in this district pursuant to Federal Rule of Civil Procedure 4(k)(2) because (i) Defendants are not subject to jurisdiction in any state's court of general jurisdiction; and (ii) exercising jurisdiction is consistent with the United States Constitution and laws.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 since Defendants are, upon information and belief, non-residents in the United States and engaged in infringing activities and causing harm within this district by advertising, offering to sell, selling and/or shipping infringing products into this district.

---

[2] Some Defendants use their Subject Domain Names to act as supporting domain names to direct traffic to their fully interactive, commercial websites operating under other Subject Domain Names, from which consumers can complete purchases. These redirecting websites are identified as such in Composite Exhibit "7" attached hereto.

Some Subject Domain Names, although interactive, do not offer prices for products and/or the shopping cart feature; rather, consumers are able to browse the listings of products bearing and/or using Plaintiffs' trademarks via the websites, ultimately allowing customers to inquire and make direct purchases of those products via electronic communication, including e-mail and/or private messaging services such as WhatsApp.

## **THE PLAINTIFFS**

4.      Plaintiff Richemont International SA ("Richemont") is a public limited company organized and existing under the laws of Switzerland, having its principal place of business at 10 Route des Biches, Villars-sur-Glane, Fribourg, Switzerland. Richemont's Maisons include, *inter alia*, IWC Schaffhausen ("IWC").

5.      Plaintiff Cartier International A.G. ("Cartier") is a public limited company organized and existing under the laws of Switzerland, having its principal place of business at Hinterbergstrasse 22, Postfach 61, 6312 Steinhausen, Switzerland.

6.      Plaintiff Chloe S.A.S. ("Chloe") is a company organized and existing under the laws of France, having its principal place of business at 5/7 Avenue Percier, 75008 Paris, France.

7.      Plaintiff Montblanc-Simplo GMBH ("Montblanc") is a company organized and existing under the laws of Germany, having its principal place of business at Hellgrundweg 100, 22525 Hamburg, Germany.

8.      Plaintiff Officine Panerai A.G. ("Panerai") is a public company organized and existing under the laws of Switzerland, having its principal place of business at Hinterbergstrasse 22, Postfach 61, 6312 Steinhausen, Switzerland.

9.      Plaintiff Van Cleef & Arpels SA ("Van Cleef") is a company organized and existing under the laws of Switzerland, having its principal place of business at 8 Route des Biches, CH-1752 Villars-sur-Glane, Switzerland.

10.      Plaintiffs' trademarked goods are offered for sale and sold within the State of Florida, including within this district, and throughout the United States. Defendants, through the advertising, sale, and offers to sell counterfeit and infringing versions of Plaintiffs' branded products, are directly, and unfairly, competing with Plaintiffs' economic interests in the United

States, including the State of Florida, and causing Plaintiffs irreparable harm within this jurisdiction.

11.     Like many other famous trademark owners, Plaintiffs suffer ongoing daily and sustained violations of their respective trademark rights at the hands of counterfeiters and infringers, such as Defendants herein, who wrongfully reproduce and counterfeit Plaintiffs' trademarks for the twin purposes of (i) duping and confusing the consuming public and (ii) earning substantial profits across their e-commerce websites.

12.     To combat the indivisible harm caused by the concurrent actions of Defendants and others engaging in similar conduct, each year Plaintiffs expend significant monetary and other resources in connection with trademark enforcement efforts, including legal fees, investigative fees, and support mechanisms for law enforcement. The exponential growth of counterfeiting over the Internet has created an environment that requires companies, such as Plaintiffs, to expend significant resources across a wide spectrum of efforts to protect both consumers and themselves from confusion and the erosion of the goodwill embodied in Plaintiffs' brands.

## THE DEFENDANTS

13.     Defendants operate through domain names registered with registrars in multiple countries, including the United States, and are comprised of individuals, business entities of unknown makeup, and/or unincorporated associations each of whom, upon information and belief, either reside and/or operate in foreign jurisdictions, or redistribute products from the same or similar sources in those locations. Defendants have the capacity to be sued pursuant to Federal Rule of Civil Procedure 17(b). Defendants target their business activities toward consumers throughout the United States, including within this district, through the simultaneous operation of,

at least, the fully interactive commercial Internet websites existing under the Subject Domain Names.

14.     Defendants use aliases in conjunction with the operation of their businesses, including but not limited to those identified by Defendant Number on Schedule "A" hereto.

15.     Defendants are directly and personally contributing to, inducing and engaging in the sale of counterfeit branded products as alleged herein, often as partners, co-conspirators and/or suppliers.

16.     Defendants are part of an ongoing scheme to create and maintain an illegal marketplace enterprise on the World Wide Web, which (i) confuses consumers regarding the source of Defendants' goods for profit, and (ii) expands the marketplace for illegal, counterfeit versions of Plaintiffs' branded goods while shrinking the legitimate marketplace for Plaintiffs' genuine branded goods.  The natural and intended byproduct of Defendants' combined actions is the erosion and destruction of the goodwill associated with Plaintiffs' respective famous names and associated trademarks, and the destruction of the legitimate market sector in which they operate.

17.     Defendants are the past and present controlling forces behind the operation of the Internet websites operating under, at least, the Subject Domain Names.

18.     Defendants directly engage in unfair competition with Plaintiffs by (i) advertising, offering for sale and/or selling goods bearing and/or using counterfeits and infringements of one or more of Plaintiffs' trademarks to consumers within the United States and this district through at least the interactive, commercial Internet websites operating under the Subject Domain Names and corresponding website Uniform Resource Locator ("URL"), and any additional domains and websites and corresponding website URLs not yet known to Plaintiffs and (ii) creating and

maintaining an illegal marketplace enterprise for the purpose of diverting business from Plaintiffs' legitimate marketplace for their genuine goods. Defendants have purposefully directed some portion of their unlawful activities towards consumers in the State of Florida through the advertisement, offer to sell, and/or sale of counterfeit and infringing branded versions of Plaintiffs' branded goods into the State, and by operating an illegal marketplace enterprise which impacts and interferes with legitimate commerce throughout the United States, including within the State of Florida.

19.     Defendants have registered, established, or purchased, and maintained the Subject Domain Names and the websites operating thereunder. Defendants may have engaged in fraudulent conduct with respect to the registration of the Subject Domain Names by providing false and/or misleading information during the registration or maintenance process related to their respective Subject Domain Names. Many Defendants have registered and/or maintained some of their Subject Domain Names for the sole purpose of engaging in unlawful counterfeiting and/or infringing activities.

20.     Defendants will likely continue to register or acquire new domain names, and consequently new URL addresses in connection therewith, for the purpose of selling and offering for sale goods bearing and/or using counterfeit and confusingly similar imitations of Plaintiffs' trademarks unless preliminarily and permanently enjoined. Moreover, Defendants will likely continue to maintain and grow their illegal marketplace enterprise at Plaintiffs' expense unless preliminarily and permanently enjoined.

21.     Defendants' Subject Domain Names and corresponding website URLs, and any other alias domain or e-commerce store names and corresponding websites' URLs, used in connection with the sale of counterfeit and infringing goods bearing and/or using one or more of

Plaintiffs' trademarks are essential components of Defendants' online activities and are the means by which Defendants further their counterfeiting and infringement scheme and cause harm to Plaintiffs. Moreover, Defendants are using Plaintiffs' famous names and/or trademarks to drive Internet consumer traffic to their websites operating under the Subject Domain Names, thereby increasing the value of the Subject Domain Names and decreasing the size and value of Plaintiffs' legitimate marketplace and intellectual property rights at Plaintiffs' expense.

## COMMON FACTUAL ALLEGATIONS

### Richemont's Trademark Rights

22.     Richemont is the owner of all rights, title, and interest in the following trademarks, which are valid and registered on the Principal Register of the United States Patent and Trademark Office (the "IWC Marks"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| IWC | 1,205,403 | August 17, 1982 | IC 014 - Watches |
| PORTOFINO | 1,846,680 | July 26, 1994 | IC 014 – Watches |
| **IWC** SCHAFFHAUSEN | 4,270,382 | January 8, 2013 | IC 014 - Watches, chronometers, clocks; straps for wristwatches, boxes of precious metal for watches and all the aforementioned goods from Switzerland |
| IWC | 4,322,600 | April 23, 2013 | IC 014 - Watches, chronometers, clocks, watch bands, boxes of precious metal for watches |
| PORTUGIESER | 4,412,785 | October 8, 2013 | IC 014 - Watches, chronometers, clocks, watch straps, watch bracelets, and boxes of precious metals for watches |

The IWC Marks are used in connection with the manufacture and distribution of high-quality goods in the categories identified above. True and correct copies of the Certificates of Registration for the IWC Marks are attached hereto as Composite Exhibit "1."

23.     The IWC Marks have been used in interstate commerce to identify and distinguish IWC's high-quality goods for an extended period of time. The IWC Marks are symbols of IWC's quality, reputation and goodwill and have never been abandoned.

24.     Further, IWC expends substantial resources developing, advertising and otherwise promoting the IWC Marks. The IWC Marks qualify as famous marks as that term is used in 15 U.S.C. §1125(c)(1).

25.     IWC extensively uses, advertises and promotes the IWC Marks in the United States in association with the sale of high-quality goods. As a result, the IWC Marks are among the most widely recognized trademarks in the United States, and the trademarks have achieved secondary meaning as an identifier of high-quality goods.

26.     IWC has carefully monitored and policed the use of the IWC Marks and has never assigned or licensed the IWC Marks to any Defendant in this matter.

27.     Genuine goods bearing and/or using the IWC Marks are widely legitimately advertised and promoted by IWC, its authorized distributors, and unrelated third parties via the Internet.  Visibility on the Internet, particularly via Internet search engines and social media platforms, is important to IWC's overall marketing and consumer education efforts. Thus, IWC expends significant monetary and other resources on Internet marketing and consumer education, including search engine optimization ("SEO"), search engine marketing ("SEM"), and social media strategies. Those strategies allow IWC and its authorized retailers to educate consumers fairly and legitimately about the value associated with the IWC brand and the goods sold

thereunder. Similarly, many of Defendants' websites are indexed on search engines and compete directly with Plaintiffs for space and consumer attention in search results.

**Cartier's Trademark Rights**

28.     Cartier is the owner of all rights in and to the following trademarks, which are valid and registered on the Principal Register of the United States Patent and Trademark Office (the "CARTIER Marks"):

| Registered Trademark | Registration Number | Registration Date | Classes/Goods |
|---|---|---|---|
| CARTIER | 0,411,239 | January 9, 1945 | IC 014 - Precious-Metal Ware-namely, the following articles made, in whole or in part, of Precious Metals or Plated With the Same; Jewel Boxes, Fobs, Bracelets, Watch Bracelets And Buckles Therefore, not including Watches, Cuff Links, Brooches, Earrings, Eyeglass Cases, Cigarette Lighters, Ash Trays, Envelope Openers, Wallets, Money Clips, Perfume Bottles, Desk Sets, Handbags, Key Chains, Finger Rings. |
| *Cartier* | 0,411,240 | January 9, 1945 | IC 014 - Articles of Jewelry for Personal Wear and for Precious-Metal Ware-Namely, the Following Articles Made, in Whole or in Part, of Precious Metals or Plated with the Same-- viz, Jewel Boxes, Fobs, Bracelets, Watch Bracelets and Buckles Therefor, Not Including Watches, Cuff Links, Brooches, Earrings, Eyeglass Cases, Cigarette Lighters, Ash Trays, Envelope Openers, Wallets, Money Clips, Perfume Bottles, Desk Sets, Handbags, Key Chains, Finger Rings |
| *Cartier* | 0,411,975 | February 13, 1945 | IC 014 - Watches and Clocks and Wrist Watches with Wrist Straps and Bracelets Attached for Securing the Same on the Wrist of the Wearer, and Traveling Clocks and Watches with Covers of Leather, Fabric and the Like for Protecting Them While Traveling |

| CARTIER | 0,759,201 | October 29, 1963 | IC 014 - Watches and Clocks |
|---|---|---|---|
| ₵ | 1,114,482 | March 6, 1979 | IC 014 - Articles of jewelry, watches |
| SANTOS | 1,344,284 | June 25, 1985 | IC 014 - Watches |
| BALLON BLEU | 3,476,888 | July 29, 2008 | IC 014 - Watches, Chronometers, Clocks |
| Cartier | 4,178,047 | July 24, 2012 | IC 014 - Jewelry and watches |

The CARTIER Marks are used in connection with the manufacture and distribution of high-quality goods in the categories identified above. True and correct copies of the Certificates of Registration for the CARTIER Marks are attached hereto as Composite Exhibit "2."

29.    The CARTIER Marks have been used in interstate commerce to identify and distinguish Cartier's high-quality goods for an extended period of time. The CARTIER Marks are symbols of Cartier's quality, reputation and goodwill and have never been abandoned.

30.    Further, Cartier and related companies expend substantial resources developing, advertising and otherwise promoting the CARTIER Marks. The CARTIER Marks qualify as famous marks as that term is used in 15 U.S.C. §1125(c)(1).

31.     Cartier and related companies extensively use, advertise and promote the CARTIER Marks in the United States in association with the sale of high-quality goods. As a result, the CARTIER Marks are among the most widely recognized trademarks in the United States, and the trademarks have achieved secondary meaning as an identifier of high-quality goods.

32.     Cartier has carefully monitored and policed the use of the CARTIER Marks and has never assigned or licensed the CARTIER Marks to any Defendant in this matter.

33.     Genuine goods bearing and/or using the CARTIER Marks are widely legitimately advertised and promoted by Cartier and related companies, and authorized distributors via the Internet.   Visibility on the Internet, particularly via Internet search engines and social media platforms, is important to Cartier's overall marketing and consumer education efforts. Thus, Cartier expends significant monetary and other resources on Internet marketing and consumer education, including SEO, SEM, and social media strategies. Those strategies allow Cartier and its authorized retailers to educate consumers fairly and legitimately about the value associated with the Cartier brand and the goods sold thereunder. Similarly, many of Defendants' websites are indexed on search engines and compete directly with Plaintiffs for space and consumer attention in search results.

### Chloe's Trademark Rights

34.     Chloe is the owner of all rights in and to the following trademarks, which are valid and registered on the Principal Register of the United States Patent and Trademark Office (the "CHLOE Marks"):

| Registered Trademark | Registration Number | Registration Date | Classes/Goods |
|---|---|---|---|
| Chloé | 0,950,843 | January 16, 1973 | IC 010, 025, 026 - Ladies' articles of clothing for outerwear-namely, frocks, dresses, coats, costumes, suits, skirts, blouses, vests and pant-suits; vests, |

| | | | |
|---|---|---|---|
| | | | and ladies' shoes |
| CHLOE | 1,491,810 | June 14, 1988 | IC 018 - Handbags, Purses |
| **SEE BY CHLOE** | 2,641,982 | October 29, 2002 | IC 018 - travelling bags, holdalls, tote bags, handbags, credit card case; purses, wallets, key cases, coin purses, parts and fittings for all the aforesaid goods<br><br>IC 025 - clothing, namely, trousers, skirts, dresses, jackets, shirts, coats, cardigans, sweaters, blouses, shorts, t-shirts, pullovers |
| Chloé | 3,291,996 | September 11, 2007 | IC 018 - Goods made of leather and imitations of leather, namely, handbags, purses, credit card cases and holders, key cases, coin purses |

The CHLOE Marks are used in connection with the manufacture and distribution of high quality goods in the categories identified above. True and correct copies of the Certificates of Registration for the CHLOE Marks are attached hereto as Composite Exhibit "3."

35.     The CHLOE Marks have been used in interstate commerce to identify and distinguish Chloe's high-quality goods for an extended period of time. The CHLOE Marks are symbols of Chloe's quality, reputation and goodwill and have never been abandoned.

36.     Further, Chloe expends substantial resources developing, advertising and otherwise promoting the CHLOE Marks. The CHLOE Marks qualify as a famous marks as that term is used in 15 U.S.C. §1125(c)(1).

37.     Chloe extensively uses, advertises and promotes the CHLOE Marks in the United States in association with the sale of high-quality goods. As a result, the CHLOE Marks are among the most widely recognized trademarks in the United States, and the trademarks have achieved secondary meaning as an identifier of high-quality goods.

38.     Chloe has carefully monitored and policed the use of the CHLOE Marks and has never assigned or licensed the CHLOE Marks to any Defendant in this matter.

39.     Genuine goods bearing and/or using the CHLOE Marks are widely legitimately advertised and promoted by Chloe, its authorized distributors, and unrelated third parties via the Internet. Visibility on the Internet, particularly via Internet search engines and social media platforms, is important to Chloe's overall marketing and consumer education efforts. Thus, Chloe expends significant monetary and other resources on Internet marketing and consumer education, including SEO, SEM, and social media strategies. Those strategies allow Chloe and its authorized retailers to educate consumers fairly and legitimately about the value associated with the Chloe brand and the goods sold thereunder. Similarly, many of Defendants' websites are indexed on search engines and compete directly with Plaintiffs for space and consumer attention in search results.

**Montblanc's Trademark Rights**

40.     Montblanc is the owner of all rights in and to the following trademarks, which are valid and registered on the Principal Register of the United States Patent and Trademark Office (the "MONTBLANC Marks").

| Registered Trademark | Registration Number | Registration Date | Classes/Goods |
|---|---|---|---|
| MONTBLANC | 0,776,208 | September 1, 1964 | IC 016 - Fountain Pens, Cases for Fountain Pens, Ball Point Pens, Ball Point Cartridges, Ball Point Paste, Mechanical Pencils, Lead for Mechanical Pencils |

| | | | |
|---|---|---|---|
|  | 0,839,016 | November 21, 1967 | IC 002 - Fountain pen ink<br><br>IC 016 - Fountain pens, cases for fountain pens, ball point pens, ball point cartridges, mechanical pencils, lead for mechanical pencils, desk stands for pens |
|  | 1,878,584 | February 14, 1995 | IC 014 - Jewelry, watches and timepieces<br><br>IC 018 - Purses, handbags, small leather articles and accessories, namely wallets and billfolds, and luggage |
| MONTBLANC | 1,884,842 | March 21, 1995 | IC 014 - Jewelry, watches and timepieces<br><br>IC 018 - Purses, handbags, small leather articles and accessories, namely wallets and billfolds, and luggage |
| STARWALKER | 2,759,073 | September 2, 2003 | IC 016 - Fountain pens, ball-point pens, pencils, felt-tip pens, rollerballs |
| TIMEWALKER | 2,775,693 | October 21, 2003 | IC 014 - Wrist watches. |
|  | 4,669,133 | January 13, 2015 | IC 014 - Jewelry; precious stones; precious metals and their alloys; cufflinks; tie clips; rings; bracelets; earrings; necklaces; brooches; key rings of precious metal; jewelry cases; boxes of precious metals; horological and chronometric instruments; watches; chronometers; clocks; small clocks; watch cases; watch bands; watch bracelets; key rings, trinkets, or fobs of precious metal |

| | | | IC 016 - Stationery; articles of paper or cardboard, namely, boxes, bags, envelopes and pouches for packaging; wrapping paper; writing instruments; pouches for writing instruments; cases for writing instruments; inks and ink refills for writing instruments; desk sets; writing books; calendars, note books, card and document files, announcement cards; writing paper, envelopes, index cards; business cards; writing pads; writing instrument holders; paperweights; diaries, cover for diaries, replacement papers for diaries; inkwells; check book holders, passport holders; document holders and cases; photo albums; bookends; money clips; writing cases for writing instruments <br><br> IC 018 - Handbags, travelling bags, rucksacks, garment bags for travel, traveling sets comprised of luggage, suitcases, bags for sports, wheeled bags, wallets, purses, name cards cases, briefcases, attaché cases, key cases of leather or imitation leather; travelling trunks; unfitted vanity cases; evening purses; leather straps; boxes of leather or leather board, trunks and suitcases; credit card holder |
|---|---|---|---|

The MONTBLANC Marks are used in connection with the manufacture and distribution of high-quality goods in the categories identified above. True and correct copies of the Certificates of Registration for the MONTBLANC Marks are attached hereto as Composite Exhibit "4."

41.     The MONTBLANC Marks have been used in interstate commerce to identify and distinguish Montblanc's high-quality goods for an extended period of time. The MONTBLANC Marks are symbols of Montblanc's quality, reputation and goodwill and have never been abandoned.

42.     Further, Montblanc expends substantial resources developing, advertising and otherwise promoting the MONTBLANC Marks. The MONTBLANC Marks qualify as famous marks as that term is used in 15 U.S.C. §1125(c)(1).

43.     Montblanc extensively uses, advertises and promotes the MONTBLANC Marks in the United States in connection with the sale of high-quality goods. As a result, the MONTBLANC Marks are among the most widely recognized trademarks in the United States, and the trademarks have achieved secondary meaning as an identifier of high-quality goods.

44.     Montblanc has carefully monitored and policed the use of the MONTBLANC Marks and has never assigned or licensed the MONTBLANC Marks to any Defendant in this matter.

45.     Genuine goods bearing and/or using the MONTBLANC Marks are widely legitimately advertised and promoted by Montblanc, its authorized distributors, and unrelated third parties via the Internet. Visibility on the Internet, particularly via Internet search engines and social media platforms, is important to Montblanc's overall marketing and consumer education efforts. Thus, Montblanc expends significant monetary and other resources on Internet marketing and consumer education, including SEO, SEM, and social media strategies. Those strategies allow Montblanc and its authorized retailers to educate consumers fairly and legitimately about the value associated with the Montblanc brand and the goods sold thereunder. Similarly, many of Defendants' websites are indexed on search engines and compete directly with Plaintiffs for space and consumer attention in search results.

<u>**Panerai's Business and Trademark Rights**</u>

46.     Panerai is the owner of all rights in and to the following trademarks, which are valid

and registered on the Principal Register of the United States Patent and Trademark Office (the

"PANERAI Marks"):

| Registered Trademark | Registration Number | Registration Date | Classes/Goods |
|---|---|---|---|
| PANERAI | 2,340,290 | April 11, 2000 | IC 014 - Chronometers, watches |
| RADIOMIR | 2,418,830 | January 9, 2001 | IC 014 - Chronometers; watches and clocks. |
| LUMINOR | 2,516,018 | December 11, 2001 | IC 014 - Chronometers, watches and clocks |
|  | 3,004,529 | October 4, 2005 | IC 014 - Boxes and cases for watches; chronometers, watches |
| OFFICINE PANERAI | 4,009,035 | August 9, 2011 | IC 014 - Watches and clocks; watch accessories, namely, watch straps, and buckles for watch bands and watch straps. |
| LUMINOR MARINA | 5,763,549 | May 28, 2019 | IC 014 - Chronometers; watches |
| PANERAI SUBMERSIBLE | 5,848,650 | September 3, 2019 | IC 014 - Chronometers; watches and clocks; watch movements; watch straps; watch bracelets; presentation boxes for watches; cases adapted for holding watches |

The PANERAI Marks are used in connection with the manufacture and distribution of high-quality

goods in the categories identified above. True and correct copies of the Certificates of Registration

for the PANERAI Marks are attached hereto as Composite Exhibit "5."

47.     The PANERAI Marks have been used in interstate commerce to identify and distinguish Panerai's high-quality goods for an extended period of time. The PANERAI Marks are symbols of Panerai's quality, reputation and goodwill and have never been abandoned.

48.     Further, Panerai expends substantial resources developing, advertising and otherwise promoting the PANERAI Marks. The PANERAI Marks qualify as famous marks as that term is used in 15 U.S.C. §1125(c)(1).

49.     Panerai extensively uses, advertises and promotes the PANERAI Marks in the United States in association with the sale of high-quality goods. As a result, the PANERAI Marks are among the most widely recognized trademarks in the United States, and the trademarks have achieved secondary meaning as an identifier of high-quality goods.

50.     Panerai has carefully monitored and policed the use of the PANERAI Marks and has never assigned or licensed the PANERAI Marks to any Defendant in this matter.

51.     Genuine goods bearing and/or using the PANERAI Marks are widely legitimately advertised and promoted by Panerai, its authorized distributors, and unrelated third parties via the Internet. Visibility on the Internet, particularly via Internet search engines and social media platforms, is important to Panerai's overall marketing and consumer education efforts. Thus, Panerai expends significant monetary and other resources on Internet marketing and consumer education, including SEO, SEM, and social media strategies. Those strategies allow Panerai and its authorized retailers to educate consumers fairly and legitimately about the value associated with the Panerai brand and the goods sold thereunder. Similarly, many of Defendants' websites are indexed on search engines and compete directly with Plaintiffs for space and consumer attention in search results.

**Van Cleef's Trademark Rights**

52.     Van Cleef is the owner of all rights in and to the following trademarks, which are

valid and registered on the Principal Register of the United States Patent and Trademark Office

(the "VAN CLEEF Marks"):

| Registered Trademark | Registration Number | Registration Date | Classes/Goods |
|---|---|---|---|
| Van Cleef & Arpels | 1,415,794 | November 4, 1986 | IC 014 - Jewelry and Watches |
| VCA | 1,584,572 | February 27, 1990 | IC 014 – Jewelry |
| VC A | 2,692,672 | March 4, 2003 | IC 014 – Jewelry; Watches |
| ALHAMBRA | 2,751,878 | August 19, 2003 | IC 014 - Precious Metal And Their Alloys And Products Made Thereof Or Coated Therewith Not Included In Other Classes, Namely, Jewelry, Horological And Chronometric Instruments, Namely, Watches And Watch Bracelets And  Necklaces, Jewelry Chains Of Precious Metal, Earrings, Jewelry Rings, Pendants, Ankle Bracelets, Cuff Links, Studs Made Of Precious Metal |
| VAN CLEEF & ARPELS | 2,936,247 | March 29, 2005 | IC 014 - Items Made Of Precious Metal, Namely, Rings, Bracelets, Earrings, Necklaces, Pendants, Charms, Brooches, Clips, Hairclips, Jewelry Boxes, Jewelry Cases, Watch Bracelets And Buckles; Jewelry, Watches And Clocks |
| ALHAMBRA | 3,489,019 | August 19, 2008 | IC 014 - Jewelry; Clock And Watch Making, Namely, Watches, Watch Bracelets |

The VAN CLEEF Marks are used in connection with the manufacture and distribution of high-quality goods in the categories identified above. True and correct copies of the Certificates of Registration for the VAN CLEEF Marks are attached hereto as Composite Exhibit "6."

53.     The VAN CLEEF Marks have been used in interstate commerce to identify and distinguish Van Cleef's high-quality goods for an extended period of time. The VAN CLEEF Marks are symbols of Van Cleef's quality, reputation and goodwill and have never been abandoned.

54.     Further, Van Cleef expends substantial resources developing, advertising and otherwise promoting the VAN CLEEF Marks. The VAN CLEEF Marks qualify as famous marks as that term is used in 15 U.S.C. §1125(c)(1).

55.     Van Cleef and related companies extensively use, advertise and promote the VAN CLEEF Marks in the United States in connection with the sale of high-quality goods. As a result, the VAN CLEEF Marks are among the most widely recognized trademarks in the United States, and the trademarks have achieved secondary meaning as an identifier of high-quality goods.

56.     Van Cleef has carefully monitored and policed the use of the VAN CLEEF Marks and has never assigned or licensed the VAN CLEEF Marks to any Defendant in this matter.

57.     Genuine goods bearing and/or using the VAN CLEEF Marks are widely legitimately advertised and promoted by Van Cleef, its authorized distributors, and unrelated third parties via the Internet. Visibility on the Internet, particularly via Internet search engines and social media platforms, is important to Van Cleef's overall marketing and consumer education efforts. Thus, Van Cleef expends significant monetary and other resources on Internet marketing and consumer education, including SEO, SEM, and social media strategies. Those strategies allow Van Cleef and its authorized retailers to educate consumers fairly and legitimately about the value

21

associated with the Van Cleef brand and the goods sold thereunder. Similarly, many of Defendants' websites are indexed on search engines and compete directly with Plaintiffs for space and consumer attention in search results.

**Defendants' Infringing Activities**

58.     Defendants are each promoting, advertising, distributing, offering for sale and/or selling goods in interstate commerce bearing and/or using counterfeit and confusingly similar imitations of one or more of the IWC Marks, CARTIER Marks, CHLOE Marks, MONTBLANC Marks, PANERAI Marks, and/or VAN CLEEF Marks (the "Counterfeit Goods") through at least the fully interactive commercial Internet websites operating under the Subject Domain Names, including the corresponding URL addresses.  True and correct copies of the web pages reflecting samples of the Internet websites operating under the Subject Domain Names displaying Plaintiffs' branded items offered for sale are attached hereto as Composite Exhibit "7."  Specifically, Defendants are using the IWC Marks, CARTIER Marks, CHLOE Marks, MONTBLANC Marks, PANERAI Marks, and/or VAN CLEEF Marks (collectively, "Plaintiffs' Marks") to initially attract online consumers and drive them to Defendants' e-commerce store websites operating under the Subject Domain Names. Defendants are each using virtually identical copies of one or more of Plaintiffs' Marks for different quality goods.  Plaintiffs have used their trademarks extensively and continuously before Defendants began offering counterfeit and confusingly similar imitations of Plaintiffs' merchandise.

59.     Defendants' Counterfeit Goods are of a quality substantially different than that of Plaintiffs' genuine goods.  Defendants are actively using, promoting and otherwise advertising, distributing, offering for sale, and/or selling substantial quantities of their Counterfeit Goods with the knowledge and intent that such goods will be mistaken for the genuine high-quality goods

offered for sale by Plaintiffs despite Defendants' knowledge that they are without authority to use Plaintiffs' Marks.  Defendants' actions are likely to cause confusion of consumers at the time of initial interest, sale, and in the post-sale setting, who will believe all of Defendants' goods offered for sale in or through Defendants' e-commerce store websites are genuine goods originating from, associated with, and/or approved by Plaintiffs.

60.     Defendants advertise their e-commerce store websites, including their Counterfeit Goods offered for sale, to the consuming public via at least the commercial websites operating under the Subject Domain Names. In so doing, Defendants improperly and unlawfully use one or more of Plaintiffs' Marks without Plaintiffs' permission.

61.     Most Defendants are concurrently employing and benefiting from substantially similar, advertising and marketing strategies based, in large measure, upon an unauthorized use of counterfeits and infringements of one or more of Plaintiffs' Marks. Specifically, Defendants are using counterfeits and infringements of Plaintiffs' respective famous names and Plaintiffs' Marks to make their websites selling unauthorized goods appear more relevant and attractive to consumers searching for both Plaintiffs' and non-Plaintiffs' goods and information online. By their actions, Defendants are contributing to the creation and maintenance of an unlawful marketplace operating in parallel to the legitimate marketplace for Plaintiffs' genuine goods. Defendants are causing individual, concurrent and indivisible harm to Plaintiffs and the consuming public by (i) depriving Plaintiffs of their right to fairly compete for space online and within search engine results and reducing the visibility of Plaintiffs' genuine goods on the World Wide Web, (ii) causing an overall degradation of the value of the goodwill associated with Plaintiffs' Marks, and/or (iii) increasing Plaintiffs' overall cost to market their goods and educate consumers about their brands via the Internet.

62.     Defendants are concurrently conducting and targeting their counterfeiting and infringing activities toward consumers and likely causing unified harm within this district and elsewhere throughout the United States.  As a result, Defendants are defrauding Plaintiffs and the consuming public for Defendants' own benefit.

63.     At all times relevant hereto, Defendants in this action had full knowledge of Plaintiffs' respective ownership of Plaintiffs' Marks, including their exclusive rights to use and license such intellectual property and the goodwill associated therewith.

64.     Defendants' use of Plaintiffs' Marks, including the promotion and advertisement, reproduction, distribution, offering for sale, and/or sale of their Counterfeit Goods, is without Plaintiffs' consent or authorization.

65.     Defendants are engaging in the above-described illegal counterfeiting and infringing activities knowingly and intentionally or with reckless disregard or willful blindness to Plaintiffs' rights for the purpose of trading on Plaintiffs' goodwill and reputations.  If Defendants' intentional counterfeiting and infringing activities are not preliminarily and permanently enjoined by this Court, Plaintiffs and the consuming public will continue to be harmed.

66.     Defendants' above identified infringing activities are likely to cause confusion, deception and mistake in the minds of consumers before, during, and after the time of purchase. Moreover, Defendants' wrongful conduct is likely to create a false impression and deceive customers into believing there is a connection or association between Plaintiffs' genuine goods and Defendants' Counterfeit Goods, which there is not.

67.     Moreover, at least Defendant Numbers 1-21 have registered, at least, one of their respective Subject Domain Name(s) using marks that are nearly identical and/or confusingly similar to at least one of Plaintiffs' Marks, (the "Cybersquatted Subject Domain Names").

68.     Defendant Numbers 1-21 have registered and/or used the Cybersquatted Subject Domain Names with the bad faith intent to profit from Plaintiffs' Marks.

69.     Defendants do not have, nor have they ever had, the right or authority to use Plaintiffs' Marks for any purpose.  Further, Plaintiffs' Marks have never been assigned or licensed to be used on any of the websites, including the websites operating under the Cybersquatted Subject Domain Names.

70.     Defendant Numbers 1-21 have provided false and/or misleading contact information when applying for the registration of the Cybersquatted Subject Domain Names or have intentionally failed to maintain accurate contact information with respect to the registration of the Cybersquatted Subject Domain Names.

71.     Defendant Numbers 1-21 have never used the Cybersquatted Subject Domain Names in connection with a bona fide offering of goods or services.

72.     Defendant Numbers 1-21 have not made any bona fide non-commercial or fair use of Plaintiffs' Marks on a website accessible under any of the Cybersquatted Subject Domain Names.

73.     Defendant Numbers 1-21 have intentionally incorporated at least one of Plaintiffs' Marks in their Cybersquatted Subject Domain Names to divert consumers looking for Plaintiffs' genuine Internet websites to their own Internet websites for commercial gain.

74.     Given the visibility of Defendants' various websites and the similarity of their concurrent actions, it is clear Defendants are either affiliated, or at a minimum, cannot help but know of each other's existence and the unified harm likely to be caused to Plaintiffs and the overall consumer market in which they operate as a result of Defendants' concurrent actions.

75.     Although some Defendants may be physically acting independently, they may properly be deemed to be acting in concert because the combined force of their actions serves to multiply the harm caused to Plaintiffs.

76.     Plaintiffs have no adequate remedy at law.

77.     Plaintiffs are suffering irreparable injury because of Defendants' unauthorized and wrongful use of Plaintiffs' Marks. If Defendants' counterfeiting and infringing, cybersquatting, and unfairly competitive activities, and their illegal marketplace enterprise are not preliminarily and permanently enjoined by this Court, Plaintiffs and the consuming public will continue to be harmed while Defendants wrongfully earn a substantial profit.

78.     The harm sustained by Plaintiffs have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offers to sell, and sale of their Counterfeit Goods and by the creation, maintenance and very existence of Defendants' illegal marketplace enterprise.

## <u>COUNT I - TRADEMARK COUNTERFEITING AND INFRINGEMENT PURSUANT TO § 32 OF THE LANHAM ACT (15 U.S.C. § 1114)</u>

79.     Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 78 above.

80.     This is an action for trademark counterfeiting and infringement against Defendants based on their use of counterfeit and confusingly similar imitations of Plaintiffs' Marks in commerce in connection with the promotion, advertisement, distribution, offering for sale, and/or sale of the Counterfeit Goods.

81.     Defendants are promoting and otherwise advertising, selling, offering for sale, and distributing goods bearing and/or using counterfeits and/or infringements of one or more of Plaintiffs' Marks. Defendants are continuously infringing and inducing others to infringe

Plaintiffs' Marks by using one or more of them to advertise, promote, offer to sell, and/or sell counterfeit and infringing goods bearing and/or using Plaintiffs' Marks.

82.     Defendants' concurrent counterfeiting and infringing activities are likely to cause and are causing confusion, mistake and deception among members of the trade and the general consuming public as to the origin and quality of Defendants' Counterfeit Goods.

83.     Defendants' unlawful actions have caused and are continuing to cause unquantifiable and irreparable harm to Plaintiffs and are unjustly enriching Defendants with profits at Plaintiffs' expense.

84.     Defendants' above-described unlawful actions constitute counterfeiting and infringement of Plaintiffs' Marks in violation of Plaintiffs' respective rights under § 32 of the Lanham Act, 15 U.S.C. § 1114.

85.     Plaintiffs have no adequate remedy at law. Plaintiffs have suffered and will continue to suffer irreparable injury while Defendants are earning a substantial profit due to Defendants' above-described activities if Defendants are not preliminarily and permanently enjoined.

## COUNT II - FALSE DESIGNATION OF ORIGIN
## PURSUANT TO § 43(a) OF THE LANHAM ACT (15 U.S.C. § 1125(a))

86.     Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 78 above.

87.     Defendants' Counterfeit Goods bearing and/or using, offered for sale, and sold using copies of one or more of Plaintiffs' Marks have been widely advertised and offered for sale throughout the United States via at least the interactive commercial Internet websites operating under the Subject Domain Names.

88.     Defendants' Counterfeit Goods bearing and/or using, offered for sale, and sold using copies of one or more of Plaintiffs' Marks are virtually identical in appearance to Plaintiffs' genuine goods. However, Defendants' Counterfeit Goods are different in quality. Accordingly, Defendants' activities are likely to cause confusion in the trade and among consumers as to at least the origin or sponsorship of their Counterfeit Goods.

89.     Defendants have used in connection with their advertisement, offer for sale, and sale of their Counterfeit Goods, false designations of origin and false descriptions and representations, including words or other symbols and designs which tend to falsely describe or represent such goods and have caused such goods to enter commerce in the United States with full knowledge of the falsity of such designations of origin and such descriptions and representations, all to Plaintiffs' detriment.

90.     Defendants have each authorized infringing uses of one or more of Plaintiffs' Marks in Defendants' advertisement and promotion of their counterfeit and infringing branded goods. Some Defendants have also misrepresented to members of the consuming public that the Counterfeit Goods being advertised and sold by them are genuine, non-infringing goods.

91.     Additionally, many Defendants are simultaneously using counterfeits and infringements of one or more of Plaintiffs' Marks to unfairly compete with Plaintiffs and others for space within organic and paid search engine and social media results. Defendants are thereby jointly (i) depriving Plaintiffs of valuable marketing and educational space online which would otherwise be available to Plaintiffs and (ii) reducing the visibility of Plaintiffs' genuine goods on the World Wide Web and across social media platforms.

92.     Defendants' above-described actions are in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

93.     Plaintiffs have no adequate remedy at law. Plaintiffs have suffered and will continue to suffer both individual and indivisible irreparable injury caused by Defendants' concurrent conduct. Absent an entry of an injunction by this Court, Plaintiffs will continue to suffer irreparable injury to their goodwill and business reputations, while Defendants are earning a substantial profit.

### COUNT III - CLAIM FOR RELIEF FOR CYBERSQUATTING PURSUANT TO §43(d) OF THE LANHAM ACT (15 U.S.C. §1125(d))
(Against Defendant Numbers 1-21 only)

94.     Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 78 above.

95.     At all times relevant hereto, Plaintiffs have been and still are the owners of the rights, title and interest in and to their respective trademarks.

96.     Defendant Numbers 1-21 have acted with the bad faith intent to profit from Plaintiffs' Marks and the goodwill associated with Plaintiffs' Marks by registering and using the Cybersquatted Subject Domain Names.

97.     Plaintiffs' Marks were already distinctive and famous at the time Defendant Numbers 1-21 registered the Cybersquatted Subject Domain Names.

98.     Defendant Numbers 1-21 have no intellectual property rights in or to Plaintiffs' Marks.

99.     The Cybersquatted Subject Domain Names are identical to, confusingly similar to or dilutive of at least one of Plaintiffs' Marks.

100.    Defendant Numbers 1-21's conduct is done with knowledge and constitutes a willful violation of Plaintiffs' rights in Plaintiffs' Marks. At a minimum, the conduct of these Defendants constitutes reckless disregard for and willful blindness to Plaintiffs' respective rights.

101.    Defendant Numbers 1-21's actions constitute cybersquatting in violation of §43(d) of the Lanham Act, 15 U.S.C. §1125(d).

102.    Plaintiffs have no adequate remedy at law. Plaintiffs have suffered and will continue to suffer irreparable injury while Defendant Numbers 1-21 profit due to the above-described activities if those Defendants are not preliminarily and permanently enjoined.

## COUNT IV - COMMON LAW UNFAIR COMPETITION

103.    Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 78 above.

104.    This is an action against Defendants based on their (i) promotion, advertisement, distribution, offering for sale, and/or sale of goods bearing and/or using marks that are virtually identical to one or more of Plaintiffs' Marks, and (ii) creation and maintenance of an illegal, ongoing marketplace enterprise operating in parallel to the legitimate marketplace in which Plaintiffs sell their genuine goods, in violation of Florida's common law of unfair competition.

105.    Specifically, Defendants are each promoting and otherwise advertising, selling, offering for sale, and/or distributing goods bearing and/or using counterfeits and infringements of one or more of Plaintiffs' Marks. Defendants are also each using counterfeits and infringements of one or more of Plaintiffs' Marks to unfairly compete with Plaintiffs and others for (i) space in search engine and social media results across an array of search terms and/or (ii) visibility on the World Wide Web.

106.    Defendants' infringing activities are likely to cause and are causing confusion, mistake, and deception among consumers as to the origin and quality of Defendants' e-commerce store websites as a whole and all products sold therein by their use of Plaintiffs' Marks.

107. Plaintiffs have no adequate remedy at law. Plaintiffs have suffered and will continue to suffer irreparable injury because of Defendants' actions while Defendants are earning a substantial profit.

## COUNT V - COMMON LAW TRADEMARK INFRINGEMENT

108. Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 78 above.

109. This is an action for common law trademark infringement against Defendants based on their promotion, advertisement, offering for sale, and sale of their Counterfeit Goods bearing and/or using one or more of Plaintiffs' Marks.

110. Plaintiffs are the owners of all common law rights in and to Plaintiffs' Marks.

111. Specifically, Defendants are promoting and otherwise advertising, distributing, offering for sale, and selling goods bearing and/or using infringements of one or more of Plaintiffs' Marks.

112. Defendants' infringing activities are likely to cause and are causing confusion, mistake and deception among consumers as to the origin and quality of Defendants' Counterfeit Goods bearing and/or using Plaintiffs' Marks.

113. Plaintiffs have no adequate remedy at law. Plaintiffs have suffered and will continue to suffer irreparable injury because of Defendants' actions while Defendants are earning a substantial profit.

## PRAYER FOR RELIEF

114. WHEREFORE, Plaintiffs demand judgment on all Counts of this Complaint and an award of equitable relief and monetary relief against Defendants as follows:

       a.     Entry of temporary, preliminary, and permanent injunctions pursuant to 15 U.S.C. § 1116, 28 U.S.C. § 1651(a), The All Writs Act, and Federal Rule of Civil Procedure 65 enjoining Defendants, their agents, representatives, servants, employees, and all those acting in concert or participation therewith, from manufacturing or causing to be manufactured, importing, advertising or promoting, distributing, selling or offering to sell their Counterfeit Goods; from infringing, counterfeiting, or diluting Plaintiffs' Marks; from using Plaintiffs' Marks, or any mark or trade dress similar thereto, in connection with the sale of any unauthorized goods; from using any logo, trade name, trademark or design that may be calculated to falsely advertise the services or goods of Defendants as being sponsored by, authorized by, endorsed by, or in any way associated with Plaintiffs; from falsely representing themselves as being connected with Plaintiffs, through sponsorship or association, or engaging in any act that is likely to falsely cause members of the trade and/or of the purchasing public to believe any goods or services of Defendants are in any way endorsed by, approved by, and/or associated with Plaintiffs; from using any reproduction, counterfeit, infringement, copy, or colorable imitation of Plaintiffs' Marks in connection with the publicity, promotion, sale, or advertising of any goods sold by Defendants; from affixing, applying, annexing or using in connection with the sale of any goods, a false description or representation, including words or other symbols tending to falsely describe or represent Defendants' goods as being those of Plaintiffs, or in any way endorsed by Plaintiffs and from offering such goods in commerce; from engaging in search engine optimization strategies using colorable imitations of Plaintiffs' names or trademarks; and from otherwise unfairly competing with Plaintiffs.

       b.     Entry of a temporary restraining order, as well as preliminary and permanent injunctions pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent

authority, enjoining Defendants and all third parties with actual notice of an injunction issued by the Court from participating in, including providing financial services, technical services or other support to, Defendants in connection with the sale and distribution of non-genuine goods bearing and/or using counterfeits and/or infringements of Plaintiffs' Marks.

        c.      Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority that, upon Plaintiffs' request, those acting in concert or participation with Defendants who have notice of the injunction, as service providers cease hosting, facilitating access to, or providing any supporting service to any and all domain names, including but not limited to the Subject Domain Names, and websites through which Defendants engage in the promotion, offering for sale and/or sale of goods bearing and/or using counterfeits and/or infringements of Plaintiffs' Marks.

        d.      Entry of an order pursuant to 15 U.S.C. § 1116, 28 U.S.C §1651(a), The All Writs Act, and the Court's inherent authority, that upon Plaintiffs' request, Defendants and the top level domain (TLD) Registry for each of the Subject Domain Names, or their administrators, including backend registry operators or administrators, place the Subject Domain Names, and any other domain names being used and/or controlled by Defendants to engage in the business of marketing, offering to sell, and/or selling goods bearing and/or using counterfeits and infringements of Plaintiffs' Marks, on Registry Hold status for the remainder of the registration period for any such domain name, thus removing them from the TLD zone files which link the Subject Domain Names, and any other domain names used by Defendants, to the IP addresses where the associated websites are hosted.

        e.      Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority, canceling for the life of the current registration or, at Plaintiffs'

election, transferring the Subject Domain Names and any other domain names used by Defendants to engage in their counterfeiting and/or infringement of Plaintiffs' Marks at issue to Plaintiffs' control so they may no longer be used for unlawful purposes.

   f. Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority, that, upon Plaintiffs' request, any Internet marketplace website operators and/or administrators, registrar and/or top level domain (TLD) Registry for the Subject Domain Names who are provided with notice of an injunction issued by the Court identify any e-mail address known to be associated with Defendants' respective Subject Domain Names.

   g. Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority, authorizing Plaintiffs to serve the injunction on any e-mail service provider with a request that the service provider permanently suspend the e-mail addresses that are or have been used by Defendants in connection with Defendants' promotion, offering for sale, and/or sale of goods bearing and/or using counterfeits and/or infringements of Plaintiffs' Marks.

   h. Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act, and the Court's inherent authority, authorizing Plaintiffs to request any Internet search engines that are provided with notice of the order, to permanently disable, de-index or delist all URLs of the Subject Domain Names by Defendants to promote, offer for sale and/or sell goods bearing and/or using counterfeits and/or infringements of Plaintiffs' Marks, based upon Defendants' unlawful activities being conducted via the Subject Domain Names as a whole and via the URLs identified by Plaintiffs.

   i. Entry of an order pursuant to 15 U.S.C. § 1116 and the Court's inherent authority requiring Defendants, their agent(s) or assign(s), to assign all rights, title, and interest, to their Subject Domain Name(s) and any other domain names used by Defendants to Plaintiffs and,

if within five (5) days of entry of such order Defendants fail to make such an assignment, the Court order the act to be done by another person appointed by the Court at Defendants' expense, such as the Clerk of Court, pursuant to Federal Rule of Civil Procedure 70(a).

j.      Entry of an order pursuant to 15 U.S.C. § 1116 and the Court's inherent authority requiring Defendants, their agent(s) or assign(s), to instruct all search engines to permanently delist or deindex the Subject Domain Name(s) and any other domain names used by Defendants, and, if within five (5) days of entry of such order Defendants fail to make such a written instruction, the Court order the act to be done by another person appointed by the Court at Defendants' expense, such as the Clerk of Court, pursuant to Federal Rule of Civil Procedure 70(a).

k.      Entry of an order requiring Defendants to account to and pay Plaintiffs for all profits earned from Defendants' trademark counterfeiting and infringing and unfairly competitive activities and that the profit award to Plaintiffs be trebled, as provided for under 15 U.S.C. §1117, or that Plaintiffs be awarded statutory damages from each Defendant in the amount of two million dollars ($2,000,000.00) per each counterfeit trademark used and product type offered for sale or sold, as provided by 15 U.S.C. §1117(c)(2) of the Lanham Act.

l.      Entry of an order requiring Defendant Numbers 1-21 to account to and pay Plaintiffs for all profits resulting from those Defendants' cybersquatting activities and that the profit award to Plaintiffs be trebled, as provided for under 15 U.S.C. §1117, or that Plaintiffs be awarded statutory damages from Defendant Numbers 1-21 in the amount of one hundred thousand dollars ($100,000.00) per cybersquatted domain name used as provided by 15 U.S.C. §1117(d) of the Lanham Act.

m.      Entry of an award pursuant to 15 U.S.C. § 1117 (a) and (b) of Plaintiffs' costs and reasonable attorneys' fees and investigative fees associated with bringing this action.

n.      Entry of an award of pre-judgment interest on the judgment amount.

o.      Entry of an Order requiring Defendants, at Plaintiffs' request, to pay the cost necessary to correct any erroneous impression the consuming public may have received or derived concerning the nature, characteristics, or qualities of Defendants' products, including without limitation, the placement of corrective advertising and providing written notice to the public.

p.      Entry of an order for any further relief as the Court may deem just and proper.

DATED: March 21, 2023.            Respectfully submitted,

STEPHEN M. GAFFIGAN, P.A.

By: **Stephen M. Gaffigan**
Stephen M. Gaffigan (Fla. Bar No. 025844)
Virgilio Gigante (Fla. Bar No. 082635)
T. Raquel Wiborg-Rodriguez (Fla. Bar. No. 103372)
Christine Ann Daley (Fla. Bar No. 98482)
401 East Las Olas Blvd., #130-453
Ft. Lauderdale, Florida 33301
Telephone: (954) 767-4819
E-mail: stephen@smgpa.cloud
E-mail: leo@smgpa.cloud
E-mail: raquel@smgpa.cloud
E-mail: christine@smgpa.cloud

Attorneys for Plaintiffs

SCHEDULE "A"
DEFENDANTS BY NUMBER AND SUBJECT DOMAIN NAME

| Defendant Number | Defendant / Domain Name |
|---|---|
| 1 | cartierclone.com |
| 1 | bestwatch.sr |
| 2 | cartierreplica.ru |
| 3 | cartierreplicawatches.co |
| 4 | chloekids.com |
| 5 | chloereplica.ru |
| 6 | chloereplica.to |
| 7 | discountchloe.com |
| 8 | iwcreplica.ru |
| 9 | iwcwatchblog.com |
| 10 | montblancpens-outlet.com |
| 11 | montblanc-sale.com |
| 12 | montblancuk.cz |
| 13 | paneraireplica.co |
| 14 | paneraireplica.ru |
| 15 | rankchloe.com |
| 16 | seebychloe.shop |
| 16 | seebychloe.store |
| 17 | seebychloefr.space |
| 18 | thechloe.shop |
| 19 | vancleefarpelsreplica.ru |
| 20 | vancleef-arpelsus.com |
| 21 | watchespanerai.ru |
| 22 | 5replicawatches.com |
| 23 | aaawatch21.com |
| 23 | aaawatches21.com |
| 24 | aleeo.shop |
| 24 | asxgvclor.xyz |
| 24 | cospai.shop |
| 24 | ecute.shop |
| 24 | elson.shop |
| 24 | fixdin.shop |
| 24 | idzysxer.online |
| 24 | kenndey.shop |
| 24 | kisae.shop |

| 24 | kmbs.shop |
| 24 | pacuo.shop |
| 24 | reada.shop |
| 24 | shoke.shop |
| 24 | tenku.shop |
| 24 | watchlove.shop |
| 24 | weefe.shop |
| 24 | ywnedhjm.online |
| 25 | bagsreplica.co |
| 26 | bestmontre.fr |
| 27 | cchenwatches.com |
| 28 | chictin.com |
| 28 | daniya.top |
| 29 | chinanoobwatch.cx |
| 29 | chinanoobwatch.co |
| 30 | colestore.ru |
| 31 | copywatches.xyz |
| 32 | cteconomicdevelopment.com |
| 33 | dolabuy.ru |
| 34 | every-designers.ru |
| 35 | fakewatchessales.com |
| 35 | fakewatchselling.com |
| 36 | faussemontre.com |
| 37 | fsfline.shop |
| 37 | sslkji.shop |
| 38 | fuwen.shop |
| 38 | greenez.shop |
| 39 | helloreplicawatch.com |
| 40 | hooo-goods.com |
| 41 | hothandbag.cn |
| 42 | ihahabags.ru |
| 43 | king-watches.cn |
| 44 | kitlife.ru |
| 45 | luxereplique.to |
| 46 | luxurywatcheshq.us |
| 47 | montredereplique.com |
| 48 | montresplus.fr |
| 49 | nhorloge.nl |
| 50 | outletluxury.shop |
| 51 | outletnoobwatch.com |

| 51 | outletnoobwatch.co |
| 52 | paschermontre.com |
| 53 | perfectbagsshop.com |
| 54 | perfectjewl.com |
| 55 | replicabagseyes.com |
| 56 | replicahandbagsale.com |
| 57 | replicawatch.top |
| 58 | replicawatches1.com |
| 59 | replicawatchesmaster.com |
| 60 | repliquesuisse.com |
| 61 | suisserepliquemontre.com |
| 62 | tikone.ru |
| 63 | trustedreplicawatch.com |
| 64 | watchoutletjp.com |
| 65 | watchs.life |